

# THE ATTORNEY GENERAL
## OF TEXAS

GERALD C. MANN                          AUSTIN 11, TEXAS
~~XXXXXXXXXXXXXX~~
**ATTORNEY GENERAL**


Honorable Bascom Giles, Commissioner
General Land Office
Austin, Texas

Dear Sir:                    Opinion No. O-6838

Re: Whether certain substances
removed from sold school land
are minerals and whether they
can be developed in accordance
with the provisions of Article
5388, et seq., R. C. S.

We refer to your letter of September 20, 1945, which
reads as follows:

"I am confronted with the problem whether cer-
tain substances removed from sold School Land origi-
nally sold with a mineral and grazing classification
prior to the effective date of Chapter 271, Acts of
the 42nd Legislature, 1931, are 'minerals' within the
meaning of the law.

"All minerals, except oil, gas, coal and lignite,
may be developed on such sold School Land in accordance
with the provisions of Articles 5388, et. seq., Revised
Civil Statutes of Texas, 1925.

"According to the information I have, the substan-
ces are scooped up from the surface to the land, or re-
latively near the surface of the land, and are shipped
to citrus fruit growing regions, where the material is
spread on orchard lands. It is my information that
such material reconditions the soil and materially aids
the orchards. As to the type of material so used, I
have been informed that it is a kind of soil composed
of various chemical substances. A sample of this material
is handed you herewith. Copies of letters from Dr. E. P.
Schoch, Director, Bureau of Industrial Chemistry,
University of Texas, and Mr. W. D. McMillan, Mining
Engineer, 214 Nash Building, Austin, Texas, are enclosed.
Also enclosed are other data and correspondence dealing
with this question. All this is forwarded to you with
the hope that it will be of some assistance.

"I respectfully request that you let me have
your opinion on the question whether such material
is a mineral within the meaning of the law and whether
such material should be developed on the above-men-
tioned sold School Land in accordance with the pro-
visions of Article 5388, et. seq., Revised Civil
Statutes of Texas, 1925."

To adequately answer your inquiry, we must not only
determine the meaning of the word "mineral", but we should
also ascertain if the Legislature had in mind minerals of
every description as well as combinations of minerals as
reflected by the analysis of the substance which is the sub-
ject of your letter. To do this we must look at Articles
5310, 5388, pertinent provisions of which are quoted in the
opinion cited below, and Article 5400 which follows:

"Art. 5400. Surface rights.---The locator or
owner of a mining claim shall have the right to oc-
cupy within the limits of his claim so much of the
surface ground as is strictly necessary for the use
and exploration of the mineral deposits and for the
building and works necessary for mining operations
and for the treating and smelting of the ore pro-
duced on such claims and to occupy within and with-
out the limits of his claim the necessary land for
right of way, for ingress and egress to and from
his claim for roadways and railways. If the lo-
cator or owner cannot agree with the owner or les-
see of the surface right in regard to the acquir-
ing of same and in regard to the compensation for
the injury incident to the opening and the working
of such mine and the acdess thereto, he may apply
to the county judge of the county in which such
mining claim is located by filing a written peti-
tion so setting forth with a sufficient description
the property and surface right sought to be taken
and the purpose for which the same is to be taken.
Such judge shall then appoint three disinterested
freeholders to examine, pass upon and determine the
damages and compensation to be paid to the owner of
such surface right or other property necessary to
be taken, and all proceedings thereunder shall be
had in accordance with the law regulating the exer-
cise of the right of eminent domain. Nothing herein
shall give the prospector or locator any grazing
right, or rights to any surface or well water in
use for livestock, or to any timber rights either

on or off the claim, to the detriment of the surface owner or lessee."

This department rendered a very well-considered opinion on the meaning of the word "mineral" on February 16, 1937, and since we find no reason to disagree with the holding in said opinion, it is felt that to quote portions of it insofar as it defines the statutory meaning of the word "mineral" would not be amiss. In this opinion the question before the department was: "Is this department authorized to enter into and deliver contracts pertaining to the operation of a granit or rock quarry or gravel or caliche pit upon state lands on a royalty basis?" Mr. Russell Rentfro, then Assistant Attorney General, wrote in part as follows:

"The pertinent provision of Article 5310, Revised Statutes, 1925, reads as follows:

"'The land included in this chapter shall be sold with the reservation of the oil, gas, coal and all other minerals that may be therein to the fund to which the land belongs and all applications shall so state.'

"Article 5388 reads as follows:

"'All valuable mineral bearing deposits, placers, veins, lodes and rock carrying metallic or non metallic substances of value except oil, natural gas, coal and lignite, that may be in any lands included in this Chapter shall be subject to development, sale and patent, as provided in this subdivision."

"The pertinent provision of Article 5383 which specifies the lands subject to the operation of Article 5388 reads as follows:

"'Any person, association of persons, corporate or otherwise, that may desire to acquire the right to prospect for and mine coal, or lignite in or under any of the following lands: - all unsold public free school land, University land, asylum land or any such lands sold with a reservation of minerals therein, - either of said substances that may be in or upon said land that was purchased with the relinquishment of the minerals therein - and all lands of which the mineral rights therein have reverted to this State as

the sovereign government, and either of said substances that may be in or upon any other public lands including islands and river beds and channels which belong to the State, may do so by complying with the following conditions.'

"The writer believes that in our attempt to ascertain just what the Legislature intended by the use of the phrase 'all other minerals that may be therein', that an exhaustive discussion of the available authorities is justified.

"Turning first to Words and Phrases, Vol. 5, and beginning on page 4513, we find among others the following definitions:

"A 'mineral' is defined by the Century Dictionary to be any constitutent of the earth's crust, more specifically an inorganic body occurring in nature, homogeneous, and having a definite chemical composition, which can be expressed by a chemical formula, and, further, having certain distinguishing physical characteristics. Bainb. Mines (4th Ed.) p. 1, defining the terms, says that it may, however, in the most enlarged sense, be described as comprising all the substances which now form or which once formed a part of the solid body of the earth, both external and internal, and which are now destitute of or incapable of supporting animal or vegatable life. Northern Pac. R. Co. v. Soderberg, 104 Fed. 425.

"This same case further adds that in a common and ordinary signification the word 'mineral' is not a synonym of 'metal' but is a comprehensive word or term including every description of stone and rock deposits whether containing metallic substances or entirely non-metallic.

"Webster defines the term 'mineral' to be any inorganic species having a definite chemical composition. However, we find that in the case of Murray vs Allred, 43 SW 355, the court held as follows:

"'In the most general sense of the term, "minerals" are those parts of the earth which are capable of being got from underneath the surface for the purpose of profit.

The term, therefore, includes coal, metal, ores of all kind, clay, stone, slate and coprolites.'

"In the case of Gibson vs Tyson, 5 Watts 37, we find that the court construed the term 'minerals' to mean all ores and other metal substances which are found between the surface of the earth and all substances which are the object of mining operations. In this same volume we find that the courts have construed the term 'minerals' to include coal, gas, oil, granite, stones, iron-ore, paint stones, salt lakes, water and all substances which are the object of mining operations.

"Words and Phrases, Vol. 3, Second Series, beginning on page 389, uses as a starting point the definition contained in the case of Kansas Natural Gas Company vs Board of Commissioners of Neosho County, 89 Pac. 750, which reads as follows:

"'The word "minerals" in the popular sense means those inorganic constituents of the earth's crust which are commonly obtained by mining or other process for bringing them to the surface for profit.'

"This same volume reiterates Webster's definition of the term 'minerals' as being any inorganic species having a definite chemical composition, repudiates its first definition by citing a case in 93 Pac. 53 which held that the term 'minerals' is not limited to substances found beneath the surface and then cites cases holding that the term 'minerals' means coal, iron-stone, freestone, fireclay, china clay, porcelain clay and every kind of stone, flint, marble, slate, brick earth, chalk, gravel, sand, gypsum, shell and water. However, the case of Sult vs Hochstetter Oil Company, 61 SE 307, cited therein, construed the term 'minerals' to include every substance that can be got from underneath the surface of the earth for the purpose of profit, but specifically held that it includes only those articles that are under the surface and do not lie loosely upon it.

"Burrills Law Dictionary, Part 2, page 718, contains a similar definition. It defines 'minerals' as

including all fossil bodies or matters dug out of
mines such as beds of stone, which may be dug by
mining or quarrying.

"From the foregoing and from the discussion
contained in 40 C. J. Page 736, we find that the word
'minerals' is a word of general language and not per
se, a term of art or trade, and as in the case of the
term 'mine', the term 'mineral' is used in so many
senses dependent upon the context that the ordinary
definitions of the dictionary throw but little light
upon its signification in a case and therefore it is
not capable of a definition of universal application
but is susceptible of limitation or expansion accord-
ing to the intention with which it is used in the par-
ticular instrument or statute. In determining its
meaning in a particular case, regard must be had not
only to the language of the instrument in which it
occurs but also to the relative position of the parties
interested and to the substance of the transaction
which the instrument embodies.

"Words and Phrases, Vol. 5, Third Series, Page
135, in addition to reiterating the number of defi-
nitions already discussed herein cites the case of
Campbell vs. Tennessee Coal, Iron and Railroad Co.,
265 SW 674, which held that a deed to land on a
mountainside largely consisting of limestone bluff,
which reserved to the grantor all mines and minerals,
contained or embedded in or on the tract, did not
reserve the limestone, although minerals in a tech-
nical sense do include limestone. Turning to our
own jurisdiction we find first the case of Gladys
City Oil, Gas and Manufacturing Company vs Right-Of
Way Oil Company, et al, 137 SW 171, the court held
as follows:

"'The right to take and use all the minerals if
it includes subsurface minerals would include not
only the right to take and use petroleum oil but
everything else coming under the definition of min-
erals upon or under the surface, that is, any consti-
tuent of the earth's crust. Full ownership of and
title to the land could carry with it nothing more
of substantial right. So, if the terms used in the

deed giving the right to use all minerals are to be taken in this broad sense, the title conveyed was in substantial effect a base or determinable fee as contended by appellees. The question presented then is as to the construction to be given the deed with special reference to the language used giving this right.'

"In the case of Carothers vs Mills, 233 SW 155, the court held that in its broadest and scientific meaning, a mineral is any inorganic species having a definite chemical composition, held that if the parties regarded the term 'mineral' in the popular and usual view of its meaning that it should control rather than any precise legal meaning.

"In the case of Marvel vs Merritt, 116 U.S. 11, the Supreme Court of the United States held that the word 'mineral' is evidently derived from the word 'mine' as being that which is usually obtained from a mine and distinguished from the pits from which only stones are taken and which are called quarries.

"Thus we see that the term 'mineral' is one susceptible of a great many and varied significations. We have already determined that in our instant case, to give the term 'mineral' its precise legal scientific signification so as to include all matter not properly included in the animal and vegetable kingdoms, would be an absurdity. To do so would be to destroy the very grant itself by excepting therefrom the very subject of the grant - the land. However our case is still far from solution. Having determined that we cannot apply the pure scientific definition of the terms 'mineral', we are faced with the problem of just where to stop in restricting its signification. Should we restrict the term so as to include merely the statutory specified minerals and minerals of like character or should we confine it purely to metallic ores and precious stones? Should we enlarge its signification so as to include in addition to metallic ores and precious stones all mineral substances of profit found beneath the surface of the earth or should we include

those same substances found lying loosely upon the surface?  If we adopt the view that the term 'mineral' is restricted to those substances found beneath the surface of the earth, we must make at least one exception.  As early as June 31, 1837 the State of Texas in reserving gold, silver, copper, lead and other minerals specifically enumerated as one of those minerals, salt.  Surely this latter Act of the Legislature reserving minerals in the state lands would include all salt deposits.  The foregoing discussion, if it serves no other purpose, has convinced the writer that the only reasonable rule is that each case must be decided upon the language of the statute, the surrounding circumstances, and the intention of the grantor, if it can be ascertained.

"With this in mind, what is the language used in the relevant statutes?  Article 5310 speaks of the reservation of the oil, gas, coal and all other minerals that may be therein.  Article 5388 deals with the development of valuable mineral bearing deposits, placers, veins, lodes and rock-carrying metallic or non-metallic substances of value that may be in any lands.  Article 5383 dealing with the development of certain land for coal or lignite-in and under any unsold free school and university land or any lands sold with a reservation of minerals therein and dealing with the development of those same minerals upon lands purchased with a relinquishment of the minerals and of lands in which the mineral rights have reverted to the state, and of other public lands belonging to the state and uses the terminology in and upon.

"In view of the language used by the legislature in Articles 5310 and 5388 pertaining respectively to the sale of lands with a reservation of minerals and to the development of the mineral resources in these and other lands belonging to the state, and in view of the authorities discussed in this opinion, we believe that we can fairly and safely attribute to the legislature the intention to place upon the term 'minerals' the common and ordinary signification of those mineral substances coming within the scientific signification of the term 'mineral' and found beneath the surface of the

earth and susceptible to being removed from mines for the purpose of profit. The writer appreciates that a number of these substances will doubtless be found to lie upon the surface and that no scientific reason exists for calling the self same substance lying beneath the surface a mineral and refusing to do so because it is found upon the surface. However, we must remember that we are not concerned primarily with the classification of these substances from a scientific viewpoint, but our attempt to ascertain just what the legislature intended to include by that term. We do not believe that we can fairly attribute to the legislature an intention to reserve all those substances coming within the scientific meaning of the term 'minerals' and found lying upon the surface of the earth and thus subject the State's grantee to an almost inevitable destruction of his property by quarrying operations thereon.

"Our distinction, we believe, is the just one and is one admittedly supported by various decisions from other jurisdictions.

"Returning to the specific inquiry contained in your letter we are of the opinion, in view of the foregoing authorities, and you are accordingly advised, that the term 'minerals' as used in Article 5310 and Article 5388, when viewed in conjunction with the language used in said statutory enactment, does not include gravel, sand, building stone, granite and caliche found lying upon the surface of the land and subject to quarrying operations."

Looking again at Article 5400, R.C.S., we find that the language of this statute provides for the methods of ascertaining the amount of compensation to which the surface owner would be entitled "for the injury incident to the opening and the working of such mine and the access thereto"; but no provision is written into the statute as we view it which would permit the surface owner to receive compensation for removal of soil from his lands, although he would be entitled to damages because of right of ways or damages done to the terrain of his land. Thus we believe the Legislature thought of mining or refining operations rather than the wholesale removal of strata of soil.

Turning now to the so-called "mineralized soil" which is the subject of discussion in this opinion, we quote below analyses of the samples of the materials as furnished by you, one a Chemical Analysis made by Mr. W. P. Martin of the University of Arizona and one a Spectrographic Qualitative Analysis submitted by the Raymond G. Osborne Laboratories, Los Angeles, California.

## "UNIVERSITY OF ARIZONA

| Sample Number | pH Value | Acidity (me*/100 gm.) | T S S ** (ppm) | Total Carbon (%) | Total Nitrogen (%) | Soluble Phosphate (ppm) | Available Potassium (%) |
|---|---|---|---|---|---|---|---|
| 1 | 4.8 | 7.4 | 8,084 | 0.82 | 1.063 | Trace | 0.051 |
| 2 | 6.2 | 3.1 | 17,635 | 0.64 | 0.050 | 0 | 0.074 |
| 3 | 4.9 | 13.6 | 8,084 | 3.69 | 0.167 | 0 | 0.054 |
| 4 | 4.1 | 25.5 | 12,625 | 5.14 | 0.312 | 0 | 0.067 |
| 4a | 4.6 | 15.5 | 6,342 | 3.32 | 0.136 | 0 | 0.060 |
| 5 | 4.6 | 18.6 | 6,000 | 1.85 | 0.150 | 0 | 0.078 |

(*me = Millequivalents ; ** T S S = total soluble salts)

| Sample Number | Ammonia (ppm) | Nitrate (ppm) |
|---|---|---|
| 1 | 119 | 177 |
| 2 | 252 | 4,111 |
| 3 | 183 | 815 |
| 4 | 534 | 3,969 |
| 4a | 132 | 372 |
| 5 | 135 | 408 |

Signed      W. P. Martin

"RAYMOND G. OSBORNE
Bureau of Tests
and
INSPECTION

Los Angeles, 27, 1944

REPORT OF SPECTROGRAPHIC QUALITATIVE ANALYSIS

Tests Made for:
H. B. Bagley
Room 430, Rives Strong Bldg.
Los Angeles, Calif.

Material Identification:
"Brewster County, Texas"
Samples submitted 6-22-44

RESULTS OF ANALYSIS -

| | 531 | 532 |
|---|---|---|
| Laboratory Number: | | |
| Sample Number: | 1 | 2 |
| | (Appearance – Oil Shale) | (Now being used – Rio Grande) |
| Silicon | 10.0% | 10.0% |
| Iron | 10.0 | 10.0 |
| Magnesium | 1.0 to 10.0 | 1.0 to 10.0 |
| Calcium | 1.0 to 10.0 | 1.0 to 10.0 |
| Aluminum | 1.0 to 10.0 | 1.0 to 10.0 |
| Magnanese | 1.0 to 10.0 | 1.0 to 10.0 |
| Titanium | 1.0 to 10.0 | 1.0 to 10.0 |
| Potassium | 1.0 | 1.0 |
| Sodium | 1.0 | 1.0 |
| Strontium | 1.0 | 1.0 |
| Chromium | 0.1 to 1.0 | 0.1 |
| Copper | 0.01 to 0.1 | 0.01 |
| Vandaium | 0.01 to 0.1 | 0.01 to 0.1 |
| Lead | 0.01 to 0.1 | 0.01 |
| Boron | 0.01 to 0.1 | 0.01 to 0.1 |
| Nickel | 0.01 | 0.01 |
| Cobalt | 0.001 to 0.01 | 0.01 |
| Zinc | 0.001 to 0.01 | 0.001 |
| Molybdenum | 0.001 | 0.01 |
| Barium | 0.001 | 0.1 to 1.0 |
| Silver | 0.0001 | 0.0001 |
| Gallium | 0.001 to 0.01 | 0.001 |
| Zirconium | | 0.01 |

Estimated Quantities to the Nearest Factor of Ten.

By A. Osgyani (Signed)

Respectfully submitted
RAYMOND G. OSBORNE LABORATORIES

Both of these lead the writer to conclude that the substance of the material is of such a definite chemical composition it would fit it into the definition of a "mineral" as defined by Webster, who wrote, "Anything which is neither animal nor vegetable, or in the old general classification of things into three kingdoms, (Animal, vegetable, and mineral)," or into the two definitions cited in Corpus Juris--(1) "Broad or Scientific Meaning: In its broad and scientific meaning a mineral is a natural body destitute of orginization or life; any inorganic species having a definite chemical composition; any substance which is part of the natural formation of the earth." (40 C. J., page 736, paragraph 2.) (2) "Popular meaning: The word 'mineral' is evidently derived from 'mine' or being that which is usually obtained from a mine, and in its most general and popular sense the term 'mineral' means any inorganic substance, except common soil or rock, which is found in the earth and may be obtained by mining or other process for bringing it to the surface, for manufacturing or mercantile purposes for profit. Ordinarily the term, as so defined, applies to substance under the surface of the earth and not to those lying loosely upon it. But this limitation is not an accurate one for many mineral substances are found upon or near the surface, and in any event the term will include surface minerals where such appears to be the intention of the parties." (40 C. J., page 736, paragraph 3.) Cases in point support these definitions and we find it impossible but to conclude that the so-called "mineralized soil" in question is other than a mineral.

Having concluded that the substance is a mineral does not, however, answer the question in point, i.e., is the substance a "mineral" within the meaning of Articles 5388 et seq., R.C.S.? Or, perhaps more clearly stating the question: Did the Legislature have in mind such "minerals" at the time the Act was passed in 1919? We think not. On the contrary, we believe the intention of the Legislature was to reserve for the benefit of the State such metals, minerals, or precious stones as sulphur, salt, gold, silver, oils and the like which could be clearly mined or in any way removed for their individual value as a unit, a concentrated mineral but not such a conglomeration of acids, alloys and mixture of chemicals as is reflected in the analysis of the substance in question. To hold otherwise would be to put every grantee of land holding under a deed from the State on notice that his title or rights in the surface of the soil would be constantly subject to the scrutiny of the chemists and liable to the needs or shortcomings of various soil compositions throughout the nation. Far different would be our view if the analysis, for instance, of

Mr. Osborne had shown a high percentage of the volume of the substance to be pure silver. Certainly then it would be the duty of the State to see that its interest was developed and the silver contents recovered leaving to the owner of the surface the residue therefrom. But by no stretch of the imagination can we conclude the Legislature had in mind reserving to the State various and sundry combinations of chemical compounds as may be found to be deposited in thousands of acres of land which the State has patented, deeded or otherwise released the surface thereof to grantees with a reservation of a portion or all of the mineral rights. (See Campbell vs Tennessee Coal, Iron and Railroad Co., 265 S. W. 674; Gladys City Oil, Gas and Manufacturing Company vs Right-of-Way Oil Co., et al., 137 S.W. 171; Carothers vs. Mills, 233 S.W. 155; Marvel vs. Merritt, 116 U. S. 11.) Holdings in these cases are noted in the opinion quoted, and, although we recognize the fact that they are not directly in point, we think they support our conclusion.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By /s/ E. M. De Geurin

E. M. DeGeurin
Assistant

EMDeG/JCP

APPROVED DEC. 20, 1945

/s/ Carlos C. Ashley
FIRST ASSISTANT
ATTORNEY GENERAL

(This opinion considered and approved in limited conference)